**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ALISA SPRAGGINS,              )
                                   )
           Plaintiff,         )
                                   )
      v.                     )
                                   )     No. 14 C 4035
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,    )
                                   )
          Defendant.     )
                                   )

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Plaintiff Alisa Spraggins ("Spraggins") seeks review of the Social Security Administration's ("SSA") decision to deny her application for Disability Insurance Benefits and Supplemental Security Income. After a hearing, the assigned Administrative Law Judge ("ALJ"), ALJ Kraybill, determined that even though Spraggins suffers from two severe impairments—degenerative disc disease of the cervical and lumbar spine and obesity—Spraggins is not disabled because she still has the Residual Functional Capacity ("RFC") to perform light work. On April 2, 2014, the Appeals Council denied review, rendering the ALJ's decision the final and reviewable administrative decision of defendant Carolyn W. Colvin, the Acting Commissioner of the SSA ("Commissioner"). In challenging the denial of benefits, Spraggins argues that the ALJ erred in determining Spraggins' RFC by (1) improperly analyzing the medical opinion evidence in the record, (2) failing to address Spraggins' treating physician's opinion that she cannot perform full-time work, (3) failing to address testimony by the vocational expert, and (4) improperly relying on boilerplate language in his assessment of Spraggins' credibility. The court

agrees with Spraggins' first two contentions. Accordingly, the court denies the Commissioner's motion for summary judgment (Dkt. No. 23) and remands the case to the Commissioner for further review consistent with this opinion.

## **FACTUAL BACKGROUND**

Spraggins, born on March 17, 1969, was 41 years old at the alleged onset of her disability. (Certified Copy of Admin. Record (Dkt. No. 11), hereinafter "R.," 19, 136.) Her last full-time job was as a forklift operator in a warehouse, where she worked most recently from March 2009 until September 2010, and sporadically before that from 2002 through 2008. (R. at 266.)

On May 8, 2011, Spraggins filed an application for Disability Insurance Benefits and Supplemental Security Income. (R. at 19.) In her application, Spraggins alleged that she became disabled at work on September 9, 2010, when a package she was lifting by forklift slipped from the forks, fell through the protective grating on the roof of the forklift, and struck her on the right side of head. (*Id.* at 19, 22.) The agency denied Spraggins' application on August 11, 2011, and again, after reconsideration, on October 18, 2011. (R. at 19.) Each time, the agency concluded that while the medical evidence did show "some restrictions in [Spraggins'] ability to function," and prevented her from doing her past work as a forklift operator, she remained capable of performing "other types of work which are less demanding." (R. at 78, 90.) Spraggins then filed a written Request for Hearing, which was held on January 15, 2013 before ALJ John Kraybill. (R. at 19.) The ALJ issued his written decision on January 22, 2013, likewise concluding that although the medical evidence revealed some functional restrictions, Spraggins retained "the residual functional capacity to perform light work," (R. at 25), including her "past relevant work as a bill collector." (R. at 28.) As stated earlier in this opinion, on April 2, 2014, the Appeals

Council denied review, rendering the ALJ's decision the final and reviewable. (R. at 1.) Spraggins filed this action seeking review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (Dkt. No. 1.)

At the hearing before ALJ Kraybill, Spraggins presented her medical records from her treating physicians and her own testimony. (R. at 1.) ALJ Kraybill also heard from Dr. Ashok Dr. Jilhewar, an independent medical expert, and Cheryl Hoiseth, an independent vocational expert. (*Id.*) The court reviews each category of evidence below.

## I.      Spraggins' Medical Records

### A.  Dr. Sunavo Dasgupta

On September 16, 2010, roughly one week after Spraggins was struck by a 25 pound package while operating a forklift, Spraggins visited Dr. Sunavo Dasgupta, a doctor at the Chicago Pain and Orthopedic Institute. (R. at 414.) Spraggins told Dr. Dasgupta that she noticed some right-sided neck pain immediately after the forklift incident but did not have a headache right away. (*Id.*) The next morning, however, Spraggins woke up with an excruciating headache affecting the front, back, and right side of her head. (*Id.*) By the time she visited Dr. Dasgupta, the majority of Spraggins' pain was confined to her occipital lobe (the back of her head) and the right side of her neck. (*Id.*) She also reported a shooting pain in her right arm above her elbow and noted a tingling and numbness in her hands and fingers. (*Id.*) Dr. Dasgupta ordered an MRI, physical therapy, and a series of steroid injections. (*Id.* at 417-18.) Based on the MRI and additional examinations, Dr. Dasgupta concluded that Spraggins suffered from cervical radiculitis, cervical herniated nucleus pulposus, and cervical spondylosis. He ordered her to continue her physical therapy, medications, and steroid injections. (*Id.* at 424-25.) After Spraggins' radiculopathy in her upper extremities did not respond well to the steroid injections, Dr. Dasgupta sent her to a neurosurgeon for further examination. (*Id.* at 436.)

On November 2, 2010, Spraggins saw Dr. Gregory Thurston, a neurologist, for an examination and an electromyography/nerve conduction velocity ("EMG/NCV") study. (R. at 376.) Spraggins again reported pain, numbness, and tingling, but the pain had moved predominantly to the left side of her body, rather than the right. (*Id.*) Dr. Thurston's clinical exam and the EMG/NCV study found evidence of bilateral neuropathy in three spinal segments and radiculopathy with left proximal and distal axonal denervation. (*Id.* at 379.)

**B. Dr. Theodore Fisher**

On November 11, 2010, Spraggins saw Dr. Theodore Dr. Fisher, an orthopedic and spine surgery specialist.[1] (R. at 507.) Dr. Fisher conducted a physical exam, reviewed Spraggins' earlier MRI, and reviewed four radiographs taken at his office on the day of his exam. (*Id.* at 507-508.) He concluded that Spraggins suffered from "C4-5 and C6-7 herniated nucleus pulposus with bilateral upper extremities radiculopathy, left greater than right," and a "C-spine strain." (*Id.* at 508.) Dr. Fisher advised Spraggins to continue with her nonsteroidal anti-inflammatory medications and to "increase her activity and physical therapy to be more of an active exercise program." (*Id.*)

On December 8, 2010, Spraggins returned to see Dr. Fisher and reported that although her condition had improved with physical therapy, she still had trouble using her left arm. (*Id.* at 372.) Dr. Fisher diagnosed the same conditions he identified in his November 11, 2010 examination as well as a "left shoulder impingement." (*Id.* at 373.) He administered an epidural steroid injection and recommended additional physical therapy, a daily home exercise routine,

---

[1]  Although neither the parties nor the ALJ state why Spraggins contacted Dr. Fisher, Dr. Fisher's reports make clear that Dr. Dasgupta referred Spraggins to Dr. Fisher for examination in connection with her "cervicalgia and bilateral upper extremity radiculopathy." (R. at 506.)

and potentially a second MRI scan if Spraggins' condition failed to improve. (*Id.*) Dr. Fisher ultimately ordered the second MRI on January 17, 2011, (*id.* at 369), and reviewed the results with Spraggins on March 7, 2011 and again on April 7, 2011 (*id.* at 478, 528-29.) The MRI revealed "minimal degenerative changes," but indicated that Spraggins suffered from circumferential bulging of the disc and mild canal stenosis in several spine segments. (*Id.* at 369.) Although Spraggins desired to pursue surgical options, Dr. Fisher did not "believe the pathology on the MRI scan was severe enough to be causing her symptoms and require[e] surgical intervention." (*Id.* at 478.) On April 7, 2011, because Spraggins had failed to improve with physical therapy, epidural steroid injections, medications, and time, Dr. Fisher referred her for a functional capacity evaluation to "determine her abilities and the validity of her complaints." (*Id.*)

### 1. Mitch Kaminsky's KEY Functional Assessment

On May 13, 2011, Spraggins visited Mick Kaminsky, a certified KEY specialist,[2] to undergo the KEY Functional Assessment ("Key Assessment") ordered by Dr. Fisher.[3] (R. at 463.) Kaminsky determined that Spraggins was capable of occasionally lifting 12.6 pounds and frequently lifting 8.2 pounds, sustaining a 3 to 4 hour work day, sitting for 4 to 5 hours, standing for 1 to 2 hours, and walking for 3 to 4 hours. (*Id.* at 463-64.) According to KEY's capacity scale, Spraggins' capabilities qualified her to perform work at the light physical demand level. (*Id.*)

---

[2]  KEY is a private provider of functional capacity assessments.

[3]  The first page of Kaminsky's assessment states that it is "identified to be a valid representation of the present physical capabilities of Annette Robinson." (R. at 463.) The same page contains Spraggins' name as well, so the court interprets the reference to "Annette Robinson" to be a typographical error.

On June 6, 2011, Spraggins returned to Dr. Fisher for another examination, where she again complained of neck pain, back pain, and left upper extremity radiculopathy. (*Id.* at 479.) Dr. Fisher also observed decreased sensation in the tips of the second through fifth fingers of Spraggins' left hand. (*Id.*) Following his review of Kaminsky's KEY Assessment and his re-review of Spraggins' medical history, Dr. Fisher concluded that Spraggins had achieved "maximum medical improvement," and released her to perform "light physical demand duty" work consistent with Kaminsky's KEY Assessment (Spraggins had been off of work since the September 9, 2010 accident). (*Id.* at 479-80.)

### C. Dr. Madala's RFC Assessment

On June 24, 2011, roughly six weeks after Spraggins filed her application for Disability Insurance Benefits and Supplemental Security Income and slightly more than one month after Kaminsky performed a KEY Assessment, Dr. Vidya Madala, M.D., performed an RFC assessment at the request of the Bureau of Disability Determination Services ("DDS").[4] (R. at 541.) Dr. Madala found that Spraggins could occasionally lift 20 pounds; frequently lift 10 pounds; stand or walk with a normal gait, with normal breaks, for about 6 hours in an 8-hour workday; sit for about 6 hours in an 8-hour workday; and push or pull with limitations in her left upper extremity. (*Id.* at 542, 548.) Dr. Madala also found that Spraggins could climb stairs, balance, stoop, kneel, crouch, and crawl occasionally, but that she could never climb a ladder,

---

[4]    The government and the ALJ refer to Dr. Madala as "the medical consultant to the State agency." Such an opaque description warrants further explanation. The SSA is a federal agency, and the benefits Spraggins seeks come from federal funds, but the SSA outsources initial "disability determinations" to "state disability determination services agencies." These DDS agencies rely on federal funds for their operations but are housed within state government offices. In Illinois, the Illinois Department of Human Services runs the DDS for disability claimants residing in the state. *See* Social Security Administration, *Disability Determination Services*, Office of Social Security Official Website, http://www.ssa.gov/Chicago/dds.html (last visited Apr. 23, 2015).

rope or scaffolding. (*Id.* at 543.) Finally, Dr. Madala found that Spraggins was unlimited in her handling, fingering, and feeling, but that she could only reach her left arm over her head occasionally on account of her left shoulder impingement. (*Id.* at 544, 548.)

### D. Provena Mercy Medical Center Emergency Room

On December 19, 2011, Spraggins visited the emergency room at Provena Mercy Medical Center, where she complained of pain in her middle and lower back and received an examination and x-ray. (R. at 579-87.) The x-ray revealed mild levoscoliosis and degenerative change of the lumbar spine, as well as reversal of the normal cervical lordosis, but no acute osseous injury involving the cervical or lumbar spine. (*Id.* at 596.) On January 11, 2012, Spraggins again visited the Provena emergency room with complaints of lower back pain radiating down through her legs. (*Id.* at 611.) Dr. Thomas McGivney, Provena's attending ER physician at the time, referred Spraggins for an MRI of her lumbar spine. (*Id.* 621-22.) The MRI revealed no acute abnormality, no significant central spinal stenosis, and no neural foraminal narrowing. (*Id.* at 625.) It did, however, show bilateral facet hypertrophy in two spinal segments. (*Id.*)

### E. Dr. Andrew Chenelle

On November 12, 2012, Spraggins met with a neurosurgeon named Andrew G. Chenelle, M.D., to whom she was referred by a friend who was also patient of Dr. Chenelle. (R. at 642.) Spraggins told Dr. Chenelle that she had been experiencing pain since September 9, 2010, when a box weighing 125 pounds fell on her head from 5 levels up.[5] (*Id.*) She reported 8 out of 10 pain in her neck without movement, 10 out of 10 pain radiating into her spine and throughout her legs

---

[5] Spraggins reported to Dr. Dasgupta in September 2009 that the package weighed 25 pounds, not 125. (R. at 414.)

with movement, and an "unbearabl[y] harsh" pain in her lower back. (*Id.* at 643.) She also reported numbness in her feet and tingling in her fingertips. (*Id.*)

Dr. Chenelle's physical examination of Spraggins revealed that she had limited movement of her neck from side to side because of the ongoing pain, but that she had 4 out of 5 strength in her upper arms, 1+ reflexes in her upper arms, and 1+ grip strength in both of her hands. (R. at 644.) Dr. Chenelle also noted that Spraggins walked with a normal gait and did not appear to require any assistive device. (*Id.*) Following his examination, Dr. Chenelle referred Spraggins for another course of physical therapy and to a nutritionist for "central weight loss," which Dr. Chenelle believed would significantly improve Spraggins' lumbar pain (at the time of Dr. Chenelle's examination, Spraggins stood 5'1 inches tall and weighed more than 270 pounds). (*Id.* at 642, 645.)

On January 7, 2013, Spraggins met with Dr. Chenelle for a follow-up visit. (R. at 638.) She told Dr. Chenelle that she had been attending physical therapy three times per week since their November 2012 meeting but that she did not feel the therapy was helping her at all. (*Id.*) Spraggins also reported trying to lose weight, albeit with limited success since exercising was quite painful. (*Id.*) Dr. Chenelle conducted another physical examination and found no change in Spraggins' condition, for better or worse, since his last examination in November 2012. (R. at 640.) Dr. Chenelle also noted, presumably in response to Spraggins' inquiry, that he advised Spraggins that surgery would likely make her pain worse. (*Id.*) Instead, he opined that her pain might improve with conservative therapy. (*Id.*)

## II.    Hearing Testimony

After the agency twice denied Spraggins' application for disability insurance benefits and supplemental social security income, Spraggins requested a formal hearing before an ALJ. The

hearing occurred on January 13, 2013 before ALJ Kraybill. Spraggins testified and was represented by counsel. ALJ Kraybill also heard testimony from two independent experts, Dr. Jilhewar and Cheryl Hoiseth.

## A. Spraggins' Testimony

At the hearing before ALJ Kraybill, Spraggins was represented by attorney Bradley Dworkin. (R. at 36.) She testified that she attended school for eleven years but did not reach high school and has not since obtained an equivalent certification, such as a GED. (*Id.* at 65.) Spraggins received training to operate a forklift, her primary occupation in recent years, and briefly attended cosmetology school in Canella, Illinois before dropping out because of the cost. (*Id.*) Spraggins receives food stamps and has a "pink card" from the Illinois Healthy Women Program entitling her to free family planning and birth control services, but she does not receive any other governmental assistance. (*Id.* at 54-55.)

Spraggins' "most significant" job in the past 15 years was operating a forklift or performing other manual labor in warehouses. (*Id.* at 66.) Although she was working for Aerotek when she sustained her injury, Spraggins had operated a forklift for different employers on and off from 2002 to September 2010. (*Id.* at 41, 42, 266.) She testified that any employee operating a forklift or working in a warehouse must be able to lift 75 to 100 pounds. (*Id.* at 66.) In 2008 and 2009, while she was between jobs as a forklift operator, Spraggins worked as a hair dresser and did some housecleaning for a family member. (*Id.* at 42, 266.) She testified that a hair dresser must be able to stand on her feet for most of the day and lift various devices, such as a curling iron. (*Id.* at 68.) She testified that a housecleaner must be able to lift between 15 or 20 pounds, presumably to move furniture around the house. (*Id.* at 69.) The last job Spraggins testified about was her work in customer service for Chase Bank between 2000 and 2001. (*Id.* at 67, 267.) At Chase, Spraggins sat at a desk and called Chase customers (or former customers) to

collect outstanding credit card balances. (*Id.* at 67.) Spraggins testified that she has not worked since "9/16/2[0]10," shortly after the forklift accident, and is still disputing her workers' compensation claim arising out of the incident (she has not received anything yet).[6] (R. at 41.)

Spraggins testified that she lives with her 26 year-old daughter and receives additional help from her three sons, all of whom are in their twenties. (*Id.* at 40-41.) Spraggins reported that her pain on a good day is a six or seven out of ten, and on a bad day it reaches an eight or nine. (*Id.* at 43-45.) She does not currently take any medications for her pain because she does not have health insurance to help manage the cost. (*Id.* at 50-51.) Spraggins lives on the upper level of an apartment building and regularly has to climb about 10 or 15 stairs, which she stated is particularly problematic on a cold day when she experiences shooting pains in her back area. (*Id.* at 44.) Around the house, Spraggins testified that she can wash dishes and prepare simple meals, like a sandwich or a salad, but she generally needs to take a break after standing for 10-12 minutes. (*Id.* at 45, 47.) She cannot lift anything as heavy as a gallon of milk and often cannot reach the top shelf to replace dishes. (*Id.* at 47.) Spraggins testified that she is able to take a shower, comb her hair, dress herself, and otherwise handle her personal needs, although she cannot style her hair as she used to do because of the pain in her left arm, shoulder, and neck. (*Id.* at 48.) She also cannot squat, crouch, or crawl. (*Id.* at 52-53.) Spraggins drives infrequently and only for quick tasks, such as getting gas, because she lost her driver's license after she—or somebody using her car—failed to pay past due parking tickets. (*Id.* at 49, 53-54.) Spraggins used to attend church regularly. (*Id.* at 49.) As her pain has gotten worse, however, she attends

---

[6]   In the "Work History Report" Spraggins submitted in support of her claim, she states that she has most recently worked as a forklift operator from March 2009 through October 2011. (R. at 266.) Her testimony and her medical records, however, confirm that she has not worked since September 2010, shortly after the incident giving rise to her disability claim.

only once or twice a month and typically has to adjust herself 4-5 times throughout the one hour and forty-five minute service. (*Id.* at 50.)

### B. Medical Expert's Testimony

Dr. Jilhewar testified at the hearing as an independent medical expert. Although Dr. Jilhewar never examined Spraggins himself, he testified that the "objective medical evidence" in the record allowed him to form an opinion on her "medical status." (R. at 56.) After reciting a lengthy summary of Spraggins' medical records, Dr. Jilhewar testified that Spraggins suffers from two serious impairments: cervical radiculopathy and extreme obesity. (*Id.* at 57-62.) He further testified that the combination of these two impairments did not meet or equal the severity of one of the impairments listed in the applicable regulations. (*Id.* at 62.)

The ALJ then asked Dr. Jilhewar if Spraggins' impairments would cause significant limitations in her RFC, to which Dr. Jilhewar replied "No, I have two opinions in that manner, one based strictly on the medical records." (R. at 62.) He first concluded, based strictly on the medical record, that Spraggins could perform work at the light exertional level. (*Id.* at 63.) Dr. Jilhewar noted that his conclusion matched those of Dr. Fisher, Kaminsky, and Dr. Madala. (*Id.*) Dr. Jilhewar modified his conclusion, however, after accounting for Spraggins' obesity and her testimony concerning her limited ability to use her left shoulder. Specifically, Dr. Jilhewar stated that after "taking in account extreme obesity and marked obesity and either on her—used the grades symptom described in testimony, I believe claimant is limited to the so called sedentary capacity." (*Id.*) Neither the ALJ nor Spraggins' attorney asked Dr. Jilhewar to clarify his opinion regarding Spraggins' RFC. (*Id.*)

### C. Vocational Expert's Testimony

Cheryl Hoiseth testified at the hearing as an independent vocational expert. After soliciting testimony from Spraggins concerning her past work and consulting the Dictionary of

Occupational Titles ("DOT"), Hoiseth reached the following conclusions concerning Spraggins'

past work: (1) the DOT states that working as a forklift operator or warehouse worker requires a

medium exertional level, although Spraggins performed her past work at both jobs at the heavy

exertional level; (2) the DOT states that working as a "dayworker" requires a medium exertional

level and Spraggins' performed her housecleaning work at that level; and (3) the DOT states that

working as a bill collector requires a light exertional level, although Spraggins performed her

work at Chase at the sedentary level. (*Id.* at 70.) Based on her own expertise and Spraggins'

testimony, Hoiseth opined that Spraggins could perform her past work as a bill collector at the

level she performed it in the past (sedentary) and at the level the occupation generally requires

(light). (*Id.* at 71.) Hoiseth further opined that a 43 year-old person with qualifications similar to

Spraggins' and an RFC allowing only for sedentary work could find work in the region as an

office clerk, information clerk, order clerk, or credit checker. (*Id.* at 71.)

## III.    The ALJ's Findings

ALJ Kraybill concluded that Spraggins was not under a disability from September 9,

2010 through January 22, 2013, the date of his decision. (R. at 29-30.) He followed the five-step

process set out in Social Security regulations to determine whether the claimant is entitled to

benefits. *See*  20 C.F.R. §§ 404.1520, 416.920. The five-step analysis requires the ALJ to

examine (1) whether the claimant has engaged in substantial gainful activity; (2) whether the

claimant has a severe impairment or combination of impairments; (3) whether the claimant is

automatically disabled because her severe impairment is referenced in 20 C.F.R. § 404.1520(d);

(4) if not, whether she can perform her past work given her residual functioning capacity; and (5)

if not, whether the claimant cannot perform any other work in the national economy, given her

residual functioning capacity, age, education, and work experience. *Cerentano* v. *UMWA Health & Ret. Funds*, 733 F.3d 976, 980 (7th Cir. 2013); *see also* 20 C.F.R. § 404.1520.

At Step One, ALJ Kraybill found that Spraggins had not engaged in substantial gainful activity since September 9, 2010, the onset date of her alleged disability. (R. at 21.) At Step Two, he found that Spraggins had two severe impairments: degenerative disc disease of the cervical and lumbar spine and obesity. (*Id.*) ALJ Kraybill determined that Spraggins was not automatically entitled to benefits under the Step Three and proceeded to determine her RFC for his analysis in Steps Four and Five. (*Id.* at 21-25.)

ALJ Kraybill concluded that Spraggins has the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) and could perform her past relevant work as a bill collector. (R. at 25, 28.) Specifically, ALJ Kraybill determined that Spraggins can never climb ladders, ropes, or scaffold and only occasionally climb ramps, climb stairs, balance, stoop, crouch, kneel, or crawl. (*Id.* at 25.) She also cannot make "more than frequent" use of her upper left extremity. (*Id.*) Yet ALJ Kraybill determined that Spraggins can stand and walk for 6 hours of an 8-hour workday, sit for about 6 hours of an 8-hour workday, and lift and carry 20 pounds occasionally and 10 pounds frequently. (*Id.*)

In determining Spraggins' RFC, ALJ Kraybill considered the medical evidence in the record as well as the testimony from Spraggins, Dr. Jilhewar, and Hoiseth. (*Id.* at 25.) He summarized Spraggins testimony regarding her inability to work and found it reasonable to expect that her two impairments could cause her alleged symptoms. (*Id.* at 26.) He did not, however, find her statements concerning the intensity, persistence, and limiting effects of the symptoms to be entirely credible. (*Id.*) ALJ Kraybill finally described Spraggins as "quite

functional" given her ability to drive, prepare simple meals, wash dishes, and handle her personal care. (*Id.* at 27.)

With regard to his specific RFC determination, the ALJ adopted Dr. Jilhewar's "first" opinion that, based "strictly on the medical records," Spraggins is able to perform light work. (R. at 27, 63.) The ALJ stated that his "light work" determination took into account Spraggins' credible testimony concerning her limitations and the objective medical evidence concerning how long she can walk, stand, and sit, and how much she can lift. (*Id.* at 27.) He rejected Dr. Jilhewar's "second opinion" that Spraggins should be limited to sedentary work given her obesity and her reported difficulty with her left shoulder. ALJ Kraybill did not elaborate on his reasons for discarding Dr. Jilhewar's second opinion, merely that limiting Spraggins to light work was "a more appropriate conclusion . . . in agreement with medical opinions in the record." (*Id.* at 27-28.) The ALJ finally stated that he gave the remaining opinion evidence "some weight," but not controlling weight since Dr. Jilhewar was able to review the entire file and incorporated into the testimony he gave at the hearing. (*Id.* at 28.)

## STANDARD OF REVIEW

The court performs a *de novo* review of the ALJ's legal conclusions, while giving deference to the ALJ's factual determinations. *Jones* v. *Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). In other words, the court "will uphold the Commissioner's decisions so long as the ALJ applied the correct legal standard and substantial evidence supported the decision." *See Castile* v. *Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Jones*, 623 F.3d at 1160 (quoting *Skinner* v. *Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). When reviewing for substantial evidence, the court does not substitute its own judgment for that of the ALJ by re-weighing

evidence or making credibility determinations. *Skinner*, 478 F.3d at 841. The court does, however, require that the ALJ adequately explain his decision by building "a 'logical bridge' between the evidence and the conclusions so that [the court] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Jones*, 623 F.3d at 1160 (quoting *Getch* v. *Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). "The doctrine of harmless error is . . . applicable to judicial review of administrative decisions." *Spiva* v. *Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).[7]

## ANALYSIS

Spraggins argues that ALJ Kraybill's decision erred in four respects: (1) by improperly analyzing Dr. Jilhewar's full opinion and failing to provide a logical basis for rejecting Dr. Jilhewar's ultimate conclusion regarding Spraggins' RFC; (2) by failing to provide a sound basis for discounting the opinion of Spraggins' treating physician, including his opinion that Spraggins

---

[7] Judge Posner recently expressed concern that Social Security ALJs tend to perform a "very perfunctory" review of applicants' claims and routinely deny benefits based on cherry-picked facts and improperly discounted testimony. He further was reported to have remarked in an off the bench speech on March 19, 2015 that federal trial judges "tend to rubber-stamp ALJs' decisions." *See* Patricia Manson, *Social Security ALJs in the Crosshairs*, Chicago Daily Law Bulletin (March 23, 2015), http://www.chicagolawbulletin.com/Archives/2015/03/23/ALJ-benefits-3-23-15.aspx. Indeed, ALJs have acknowledged that the pressure to meet quotas has resulted in lesser quality opinions, although Judge Posner did not express the same alarm about quality erosion when he denied the ALJs' labor claim against the SSA. *See Ass'n of Admin. Law Judges* v. *Colvin*, 777 F.3d 402, 404 (7th Cir. 2015) ("Beyond some point, increasing a worker's quota is going to induce him to spend less time on each task. If he is a worker on a poultry processing assembly line and the conveyor belt that carries the chickens to his work station for deboning is speeded up, he will spend less time deboning each chicken than he might think desirable to make sure no bits of bone are left in the chicken when it leaves his work station on the conveyor belt. In other words, the quality of his output would decline.") This court disagrees with Judge Posner's derogatory expressions about federal trial judges. This court has never known of any United States district judge acting as a "rubber-stamp." United States district judges, to this court's knowledge, endeavor to provide fair, conscientious, and meaningful review of ALJs' decisions in every case, as this court is endeavoring to do here.

could not perform full-time work; (3) by failing to address testimony by the vocational expert favorable to Spraggins; and (4) by improperly assessing Spraggins' credibility. Because the court agrees with Spraggins' first two contentions, remand is necessary.

## I.    ALJ's Analysis of Dr. Jilhewar's Testimony

Spraggins argues that the ALJ erred in his interpretation of Dr. Jilhewar's expert opinion. As discussed earlier, Dr. Jilhewar confusingly testified that he had "two opinions" regarding Spraggins' RFC. He first testified that Dr. Fisher, Kaminsky, and Dr. Madala "all have come to the same conclusion of so-called light physical capacity and I have to concur with that based strictly on medical record." (R. at 63.) But immediately following that conclusion Dr. Jilhewar gave this testimony:

> But taking in account extreme obesity and marked obesity and either on her -- used the grades [phonetic] symptom described in testimony, I believe claimant is limited to the so called sedentary capacity. In addition, in a left upper extremity, she can only use it on frequent, not often basis, that are functional limitations related to the extreme obesity, either inability to work on ladders, ropes, or scaffolds, occasional stairs, occasional balancing, stooping, kneeling, crouching, and crawling. And there are no other additional non-exertion limitations.

(R. at 63.) Although this court finds Dr. Jilhewar's testimony difficult to decipher, the ALJ apparently did not; he asked no further questions of Dr. Jilhewar following the testimony quoted above. (*Id.*) The ALJ accepted Dr. Jilhewar's characterization of his own testimony as containing "two opinions," and ultimately adopted only Dr. Jilhewar's "first" opinion that Spraggins should be limited to light work. (*Id.* at 27.) He rejected Dr. Jilhewar's "second" opinion—that Spraggins should be limited to sedentary work—because an RFC allowing light work was, in the ALJ's view, "in agreement with medical opinions in the record and there is no indication the claimant's physical impairments have worsened." (*Id.* at 28.)

The threshold problem with the ALJ's analysis is that Dr. Jilhewar did not actually offer two distinct opinions, despite his own characterization to the contrary and the ALJ's acceptance

of that characterization. The fairest reading of Dr. Jilhewar's testimony is that he believed Spraggins should be limited to light work based on the medical evidence of her degenerative disc disease. But after accounting for Spraggins' obesity—the existence of which the ALJ expressly acknowledged as an additional impairment in Step Two of his analysis (R. at 21)—Dr. Jilhewar testified that Spraggins should be limited to sedentary level work. Dr. Jilhewar's conclusion, although unartfully expressed, is consistent with his and the ALJ's obligation to consider the cumulative effects an applicant's medical problems in combination with one another. *See Goins* v. *Colvin*, 764 F.3d 677, 681 (7th Cir. 2014) (holding ALJ must consider applicant's obesity as an added handicap for someone suffering from degenerative disc disease); *Williams* v. *Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) ("As we—and other circuits—have emphasized repeatedly in reviewing denials of disability benefits . . . the *combined* effects of the applicant's impairments must be considered, including impairments that considered one by one are not disabling.") (emphasis original). So when the ALJ stated he was "adopting" Dr. Jilhewar's opinion that Spraggins can perform light work, he was adopting an opinion that Dr. Jilhewar did not offer with regard to the combined effects of Spraggins' two impairments. The ALJ could have rejected Dr. Jilhewar's opinion because Dr. Jilhewar had never treated or examined Spraggins. *See* C.F.R. §§ 404.1527(d)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.") He chose instead to adopt Dr. Jilhewar's testimony and was accordingly bound to properly construe Dr. Jilhewar's entire opinion, not merely the first half.

Even assuming Dr. Jilhewar offered two distinct opinions from which the ALJ could choose, the ALJ's reasoning for rejecting Dr. Jilhewar's "second" opinion, that Spraggins should

be limited to sedentary work, does not withstand scrutiny. According to his written decision, the ALJ rejected Dr. Jilhewar's "second" opinion because "limiting the claimant to light work is a more appropriate conclusion as that is in agreement with medical opinions in the record." (R. at 28.) He did not say which medical opinions support Dr. Jilhewar's "first" opinion, but the court infers the ALJ meant the opinions of Dr. Fisher, Kaminsky, and Dr. Madala, since those are the three Dr. Jilhewar identified as having come to "the same conclusion of so-called light physical capacity." (R. at 63.) The first problem is that both Dr. Jilhewar and the ALJ are mistaken; the reports from Dr. Fisher and Kaminsky do not support an RFC of "light work" under the SSA's regulations. The second issue is that the ALJ explicitly discounted all three purportedly supporting medical opinions in favor of the opinion Dr. Jilhewar provided at the hearing.

### A. Dr. Jilhewar Misinterpreted the Opinions of Dr. Fisher and Kaminsky

Neither Dr. Fisher nor Kaminsky found that Spraggins had a functional capacity to perform tasks within the SSA's definition of "light work." Kaminsky performed a KEY Assessment on Spraggins in May 2011, (R. at 463-64), and Dr. Fisher released Spraggins to perform light work based on Kaminsky's assessment the next month (*id.* at 480). Kaminsky found that Spraggins could occasionally lift 12.6 pounds, frequently lift 8.2 pounds, sit for 4 to 5 hours, stand for 1 to 2 hours, walk for 3 to 4 hours, and sustain a 3 to 4 hour workday. (R. at 463-64.) Although Spraggins' capabilities qualified for KEY's definition of "light physical demand level" work, the same capabilities qualify Spraggins for sedentary—not light—work under the SSA's regulations.[8] The SSA defines "light work" as lifting no more than 20 pounds at a time, frequently lifting or carrying of objects weighing up to 10 pounds, and standing or walking for a

---

[8] Spraggins' ability to lift, sit, stand, and walk are in line with the SSA's definition of sedentary. Her inability to sustain a workday longer than 3-4 hours, however, falls outside any of the SSA's work definitions.

total of 6 hours of an 8-hour workday. SSR 83-10. "Sedentary work," by contrast, requires lifting no more than 10 pounds at a time, occasionally lifting or carrying articles like docket files and small tools, and occasionally walking since, by its nature, most sedentary work is performed in the seated position. *Id.* When Dr. Jilhewar stated that Dr. Fisher and Kaminsky concluded that Spraggins could perform work at the "so-called light physical capacity," he was incorrect insofar as he meant the SSA's definition of light work. The ALJ was likewise incorrect when he stated that Dr. Fisher and Kaminsky were "in agreement" with Dr. Jilhewar's "first" opinion that Spraggins should be limited to light work.

### B. The ALJ Discounted the Opinions of Dr. Fisher and Kaminsky

The ALJ's reliance on Dr. Fisher and Kaminsky to support Dr. Jilhewar's "first opinion" is even stranger considering the very next paragraph of the ALJ's decision. The ALJ justified his decision not to give Dr. Fisher's opinion the controlling weight to which it would normally be entitled because Dr. Fisher "based his opinion on findings from [Kaminsky's] functional capacity evaluation . . . where the definition of what constitutes 'light work' differs in some ways from the Agency's definition of 'light work.'" (R. at 28.) The ALJ's reasoning is internally inconsistent. He first relied on Dr. Fisher's opinion to support his determination that Spraggins could perform the SSA's definition of "light work." Directly thereafter, however, the ALJ cited the differences between KEY's and the SSA's definition of "light work" as the reason he discounted the opinion of Dr. Fisher, Spraggins' treating specialist, in favor of Dr. Jilhewar, a non-examining expert. The court will discuss the ALJ's treatment of Dr. Fisher's and Kaminsky's evidence further in the next section. Here, it is sufficient to note that the ALJ's discounting of evidence from Dr. Fisher and Kaminsky undermines his reliance on that same evidence to support his decision to adopt Dr. Jilhewar's "first" opinion.

### C. Commissioner's Arguments

In an effort to buttress the ALJ's rejection of Dr. Jilhewar's "second" opinion, the Commissioner argues that the ALJ rightly rejected Dr. Jilhewar's "second" opinion because Dr. Jilhewar offered no supporting explanation. (Dkt. No. 24 at 5.) This argument is unpersuasive first because it is absent from the ALJ's decision. The court's review is confined to the reasoning articulated in the ALJ's decision, not the post-hoc bases submitted in a district court brief. *See S.E.C.* v. *Chenery Corp.,* 318 U.S. 80, 87-88 (1943); *Roddy* v. *Astrue*, 705 F.3d 631, 637 (7th Cir. 2013); *Phillips* v. *Astrue,* 413 F. App'x 878, 886 (7th Cir. 2010) ("These post-hoc rationalizations not only undermine our confidence in the accuracy of the Commissioner's representations of the record, but we have repeatedly warned that attempts to supplement the ALJ's decision are inappropriate.... [T]he government may not provide the missing justification for an ALJ's decision."); *Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir. 2010) (holding that "a persuasive brief [cannot] substitute for" the ALJ's deficient opinion).

Even if the ALJ was truly concerned that Dr. Jilhewar lacked support for his "second opinion," the ALJ "ha[d] a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." *Barnett* v. *Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(c)(3)); *see also Nelms* v. *Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) ("the ALJ is required to supplement the record, as necessary, by asking detailed questions, ordering additional examinations, and contacting treating physicians and medical sources to request additional records and information"). At the hearing in this case, as noted earlier, the ALJ did not ask a single question following Dr. Jilhewar's admittedly confusing delivery of his "two" opinions. If the ALJ believed that Dr. Jilhewar's "second" opinion lacked explanation—a concern that appears only in the Commissioner's brief, not the ALJ's decision—he had a duty to seek further explanation through testimony at the hearing.

Accordingly, the court finds that the ALJ erred in his analysis of Dr. Jilhewar's testimony. The ALJ incorrectly adopted Dr. Jilhewar's preliminary opinion that Spraggins could perform light work, despite Dr. Jilhewar's modification of that opinion after incorporating the combined effects of Spraggins' impairments, as he was bound to do. The ALJ justified his adoption of Dr. Jilhewar's preliminary opinion based on medical evidence from Dr. Fisher and Kaminsky, even though Dr. Fisher's and Kaminsky's reports supported Dr. Jilhewar's final opinion, which was that Spraggins should be limited to sedentary work. And the ALJ later undermined his own analysis by discounting Dr. Fisher's and Kaminsky's reports because they were based on a definition of "light work" different from the SSA's.

The Commissioner does not argue the ALJ's error was harmless. Instead, in a footnote, the Commissioner "note[s]" that the ALJ found that a Step Five finding of non-disability would apply if a sedentary RFC "were assumed," because the vocational expert testified that Spraggins could perform her past job as a bill collector at the sedentary level. (Dkt. No. 24 at 4 n.1.) Although a finding of non-disability may again be the result on remand, this court's inability to sustain the ALJ's RFC determination is alone a ground for remand. *See Bjornson* v. *Astrue*, 671 F.3d 640, 649 (7th Cir. 2012). Furthermore, as discussed in the next section of this opinion, there are additional errors that were not harmless and warrant remand, separate and apart from the ALJ's misconstruction of Dr. Jilhewar's testimony.

On remand, the ALJ should revisit his analysis of Dr. Jilhewar's testimony and engage, as Dr. Jilhewar did, in a cumulative assessment of Spraggins' degenerative disc disease and obesity. *See* 20 C.F.R. § 404.1523 ("In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your

impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process."); *Martinez*, 630 F.3d at 698 ("It is one thing to have [trouble standing and sitting because of a bad heart], it is another thing to have a bad [heart] supporting a body mass index in excess of 40."). Apart from noting at the outset of his decision that Spraggins' obesity is a severe impairment, and acknowledging his duty to decide if her obesity compounds the symptoms of her disc disease, the ALJ never discussed Spraggins' obesity in his Step Four and Five analyses. In cases where an applicant has multiple impairments, like this one, the "logical bridge from the evidence to the conclusion" must include an analysis of the combined effect of the impairments.

## II. ALJ Improperly Rejected Medical Evidence from Treating Physician

Spraggins next argues that the ALJ failed to explain his decision not to give controlling weight to the opinion of Dr. Fisher, Spraggins' treating physician. Generally, the ALJ must give "controlling weight" to the medical opinion of a treating physician "if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Larson* v. *Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (quoting 20 C.F.R. § 404.1527(c)(2)); *see also Roddy* v. *Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Scott* v. *Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Punzio* v. *Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ must offer "good reasons" for discounting a treating physician's opinion. *Larson*, 615 F.3d at 749 (internal quotation marks omitted). In other words, "[e]ven though the ALJ was not required to give [the treating physician's] opinion controlling weight, [the ALJ] was required to provide a sound explanation for his decision to reject it and instead adopt [the state agency physician's] view." *Roddy*, 705 F.3d at 636 (citations omitted).

In reaching his RFC conclusion, the ALJ did not give controlling weight to Dr. Fisher's opinion that as of June 7, 2011, Spraggins had reached "maximum medical improvement with permanent restrictions as outlined by her functional capacity evaluation of light physical demand duty work." (R. at 480.) As discussed in the previous section, the KEY Assessment Dr. Fisher incorporated into his opinion found that Spraggins could occasionally lift 12.6 pounds, frequently lift 8.2 pounds, sit for 4 to 5 hours, stand for 1 to 2 hours, walk for 3 to 4 hours, and sustain a 3 to 4 hour workday. (R. at 464.) The ALJ gave the following explanation for his decision not to give Dr. Fisher's opinion controlling weight:

> Although entitled to controlling weight under Social Security Ruling 96-6p, [Dr. Fisher's] opinion was given only some weight to the extent that it shows the claimant's ability to perform work-related activity was decreased. However, the physician based his opinion on findings from a functional capacity evaluation of the claimant where the definition of what constitutes "light work" differs in some ways from the Agency's definition of "light work["] (20 C.F.R. §§ 404.1567(b) and 416.967(b); Exhibit 5F).

(R. at 28.)

As an initial matter, the ALJ's explanation does not meet the "good reason" standard for discounting the opinion of Spraggins' treating physician. The fact that KEY's definition of "light physical demand duty work" differs from the SSA's definition of "light work" says nothing about the reliability of the medical findings underlying the KEY classification; Dr. Fisher's opinion that Spraggins should be limited to, among other things, a 3 to 4 hour workday remains unaddressed by the ALJ's decision. The ALJ's reliance on the disparate definitions of light work is even more perplexing given that the KEY scale requires *less* functionality to qualify a person for light work than the SSA's regulations. As noted earlier, the findings from the KEY Assessment—excluding the 3 to 4 hour workday limitation—qualify Spraggins for sedentary work on the SSA's disability spectrum.

Even if the ALJ had given good reasons for discounting Dr. Fisher's opinion—and the court concludes he did not—he must also explain the weight he ultimately accorded to Dr. Fisher. *Campbell* v. *Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). "The applicable regulations guide that decision by identifying several factors that an ALJ must consider: 'the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.'" *Id.*, (quoting *Larson*, 615 F.3d at 751); *see also Roddy*, 705 F.3d at 637 (noting Social Security regulations provide that "more weight should be given to the opinions of doctors who have (1) examined a claimant, (2) treated a claimant frequently and for an extended period of time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, [and] (5) offered opinions that are consistent with the objective medical evidence and the record as a whole") (citing 20 C.F.R. § 404.1527(c)(2)(i), (ii)). The Seventh Circuit frequently has criticized ALJ decisions that discount the treating physician's opinion but say nothing regarding this set of factors. *See, e.g.*, *Mueller* v. *Astrue*, 493 F. App'x 772, 776–77 (7th Cir. 2012) ("If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion.") (internal quotation marks omitted); *Campbell*, 627 F.3d at 308; *Larson*, 615 F.3d at 751; *Bauer* v. *Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (holding that if the treating physician's opinion is not given controlling weight, "the checklist comes into play").

Here, the ALJ stated the weight he accorded to Dr. Fisher's opinion—"some"—but he did not consider any of the factors the Seventh Circuit required him to address when declining to

give a treating physician's opinion controlling weight. The ALJ's entire analysis of Dr. Fisher's assessment consists of a one-sentence declaration discounting Dr. Fisher's opinion because of KEY's and the SSA's disparate definitions of light work. (R. at 28.) The court has already explained why that reasoning does not withstand scrutiny and, in any case, it does not meet the Seventh Circuit's requirement that an ALJ consider some or all of the factors on the "checklist" when determining the weight to accord the treating physician's evidence (if not controlling). *See Bauer*, 532 F.3d at 608 ("The treating-physician rule . . . list[s] various factors that the administrative law judge should consider, such as how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, and so forth.")

Accordingly, the ALJ erred when he did not articulate a sound explanation for his decision to discount Dr. Fisher's opinion and instead adopt Dr. Jilhewar's view (although he misconstrued that too). He further erred when, after discounting Dr. Fisher's opinion, he did not consider any of the treating-physician rule factors—the "checklist"—in deciding to accord Dr. Fisher's opinion only "some" weight. Dr. Fisher adopted the findings of the KEY Assessment and thus opined that Spraggins could only sustain a 3 to 4 hour workday. Because Dr. Fisher's opinion goes to the heart of the disability determination, this court cannot find that the ALJ's insufficient explanation for discounting Dr. Fisher's testimony was harmless. *See McKinzey* v. *Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). On remand, the ALJ should reconsider the medical opinion evidence provided by Dr. Fisher and, if necessary, provide a fuller explanation for his decision to discount Dr. Fisher's opinion in favor of a non-examining expert's.

## III.    Spraggins' Two Other Arguments

Given the foregoing analysis, it is unnecessary to consider Spraggins' arguments

regarding the ALJ's alleged failure to analyze all of the vocational expert's testimony and the ALJ's allegedly inadequate credibility determinations.

The vocational expert's testimony the ALJ allegedly ignored was not relevant at the time of his decision because the premise of the "ignored" hypothetical was inconsistent with the ALJ's RFC determination. The testimony at issue may, however, be relevant on remand if the ALJ ultimately changes his RFC determination, in which case the ALJ can re-examine the testimony in his revised decision.

The same reasoning applies to the ALJ's credibility determination. The court notes that the ALJ's credibility analysis contains two elements repeatedly criticized by the Seventh Circuit. First, the ALJ states that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms . . . however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible," (R. at 26), yet he fails to indicate which statements are not credible and what "not entirely" means. *See, e.g.*, *Spiva* v. *Astrue*, 628 F.3d 346, 348 (7th Cir. 2010) (criticizing the same boilerplate language). Second, the ALJ relies exclusively on Spraggins' ability to perform the activities of daily living, with help from her children, as proof that she is "quite functional." *See, e.g.*, *Bjornson* v. *Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (criticizing ALJ opinions for failure to recognize the critical differences between activities of daily living and those required by a full-time job). Despite the potential problems with the ALJ's credibility analysis, he will reconsider the medical evidence from Drs. Jilhewar and Fisher, and that process may affect his view of Spraggins' overall credibility. Accordingly, the court need not (and should not) address the ALJ's credibility analysis since it may change on remand. *Hudson* v. *Astrue*, 2009 WL 2612528, at *14 n.6 (N.D. Ill. Aug. 24, 2009) (Schenkier, M.J.) ("In light of this remand order [to reassess

an RFC determination], we find it unnecessary to address the other arguments that plaintiff has raised. On remand, the ALJ will be free to re-examine and reassess those points, including . . . his credibility decisions in determining plaintiff's RFC").

## CONCLUSION

For the reasons set forth above, the court denies the Commissioner's motion for summary judgment [23], and remands the case to the Commissioner for further review consistent with this opinion.


ENTER:


*James F. Holderman*
JAMES F. HOLDERMAN
District Judge, United States District Court


Date: May 20, 2015